UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ELVA DALE GORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:04CV0951 SNL |
| | ) | (TIA) |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration. All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

**I.    Procedural History**

On October 25, 1999, claimant Elva Dale Gore filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. and

an application for Supplemental Security Income payments pursuant to Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381, et seq. (Tr.61-63, 259-62).[1] In his applications for benefits,

claimant stated that his disability began on June 15, 1996, due to the combination of his

impairments including leg and knee problems, spina bifida occulta, bi-polar, degenerative disc

disease, osteoarthritis, and two bulging discs with one herniated. (Tr. 54-58).[2] On initial

---

[1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 12/filed October 4, 2004).

[2]On September 26, 1996, and December 17, 1998, claimant filed prior applications for the
same benefits with the same onset date of disability, June 15, 1996, which were denied by the

consideration and reconsideration, the Social Security Administration denied claimant's claims for benefits. (Tr. 54-58, 265-69). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 59-60, 40-45). On May 11, 2000, a hearing was held before an ALJ. (Tr. 354-385). Claimant testified and was represented by counsel. (Id.). In a letter dated June 27, 2000, the ALJ apprised claimant's counsel that he had secured additional evidence and would enter such evidence into the record. (Tr. 102-03). In response, counsel requested the matter be set for a supplemental hearing. (Tr. 104). On September 27, 2000, a supplemental hearing was held before an ALJ as requested by claimant's counsel so that the ALJ could enter the additional evidence into the record, and counsel could also submit additional evidence from claimant's treating sources. (Tr. 37-39, 102-04, 386-96). Claimant testified and was represented by counsel. (Id.). Thereafter, on October 27, 2000, the ALJ issued a decision denying claimant's claims for benefits. (Tr. 270-86).

On November 30, 2000, claimant filed a request for review of the ALJ's decision of October 27, 2000. (Tr. 293-97). On August 10, 2001, the Appeals Council issued a decision granting claimant's request for review and remanding the case to the ALJ to obtain vocational expert opinion regarding the extent claimant's limitations in carrying, climbing, and social

---

Appeals Council without further appeal at the initial level on March 2, 1999. (Tr. 25, 248-57). Because the Commissioner issued a final decision denying disability on March 2, 1999, the ALJ determined a finding of disability prior to March 2, 1999, is precluded under the doctrine of *res judicata* based on his finding no evidence warranting reopening the prior determinations. (Tr. 25). This final decision of the Commissioner is *res judicata* as to subsequent applications involving the same facts and issues existing at the time of the first decision and is not reviewable by this Court. Califano v. Sanders, 430 U.S. 99, 107-109 (1977). Accordingly, the ALJ properly determined that because neither fraud nor similar fault were involved in the earlier decision, the earlier decisions should not be reopened. Thus, a finding of disability at any time prior to March 2, 1999, is precluded under the doctrine of *res judicata*. The undersigned further notes that claimant does not allege error in so limiting the period covered by his current applications.

functioning erode the occupational base for medium work.  (Tr. 298-300).  Claimant requested a

hearing before an ALJ.  (Tr. 32-36).  On February 20, 2002, a hearing was held before an ALJ.

(Tr. 397-424).  Claimant testified and was represented by counsel.  (Id.)  As directed by the

Appeals Council, the ALJ submitted hypothetical questions reflecting claimant's specific

limitations to a vocational expert, J. Stephen Dolan, who timely submitted his answers to the

interrogatories to the ALJ.  (Tr. 308-19).  In response to the ALJ's offer to submit additional

interrogatories to the vocational expert, claimant's counsel forwarded additional interrogatories

the ALJ, and the vocational expert answered the same.  (Tr. 320-28).  Thereafter, on September

10, 2002, the ALJ issued a decision denying claimant's claims for benefits.  (Tr. 22-31).  On

August 27, 2004, the Appeals Council found no basis for changing the ALJ's decision and denied

claimant's request for review of the ALJ's decision.  (Tr. 6-8).  The ALJ's determination thus

stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on May 11, 2000

#### 1.  Claimant's Testimony

At the hearing on May 11, 2000, claimant testified in response to questions posed by the

ALJ and counsel.  (Tr.354-85).  At the time of the hearing, claimant was forty-four years of age.

(Tr. 358).  Claimant served for six years in the United States Army as a parts clerk.  (Tr. 363).

Claimant completed high school and is right-handed.  (Tr. 358-59).  Claimant lives in a house with

his wife and three sons, ages thirteen, six and two.  (Tr. 358).  Although he has a driver's license,

claimant testified that his wife drove him to the hearing, because the muscle spasms in his right leg

prevent him from safely operating a vehicle.  (Tr.  359).

Claimant testified that he worked as a mechanic for three years at Mayberry's Auto Repair until June, 1996. (Tr. 360). Claimant stopped working because he could no longer bend into the compartment of cars or get off the rolling creeper under cars due to back pain. (Tr. 363). Three years earlier, claimant worked as a night stocker for Wal-Mart Supercenter but left the position because of management problems. (Tr. 360, 363). Claimant testified that he worked for three years at Mode, Incorporated in Jonesboro, Georgia, building custom glass showcases for displays in eye doctor's offices. (Tr. 360-61). Claimant worked for Arrow Glass and Mirror in Morrow, Georgia, installing frames in commercial store fronts. (Tr. 361).

At the time he stopped working, claimant received treatment at the Veteran's Administration including a MRI, muscle relaxers, and antidepressants. (Tr. 363). Claimant explained that he receives treatment by Donna Yates, a nurse practitioner who prescribes Lorcet for pain, Celebrex for arthritis, and medication for peptic ulcers. (Tr. 364). Claimant has taken Lorcet for two years whenever the pain is bad. (Tr. 364). Ms. Yates ordered a MRI of claimant's lower lumbar spine, and Dr. VanNess ordered a MRI of his left shoulder, and neither one revealed anything. (Tr. 365). Claimant testified that he is not seeing any other health professionals. (Tr. 365). Claimant testified that he stopped seeing a therapist and/or psychiatrist in November,1999, and he no longer takes any medication prescribed by a psychiatrist. (Tr. 366).

Regarding his inability to work, claimant cited his back problems noting that his back bothers him twenty-four hours a day, seven days a week. (Tr. 366). Claimant has taken different medications including Valium and Triazolam, to help him sleep, but none of the medications have worked. (Tr. 366). Claimant admitted to smoking two marijuana joints every day, one in the

morning and one in the evening, for the last fifteen years. (Tr. 366-67). Claimant takes one aspirin a day and a medication for his ulcer. (Tr. 367). Claimant testified that when he is depressed, he does not do much of anything. (Tr. 371). Antidepressants do not alleviate his depression, and claimant has never been hospitalized for depression. (Tr. 371). Claimant testified that "it's been awhile since I have been depressed," approximately one month. (Tr. 373). Claimant explained how the current month he started a cycle where his manic fluctuates and the episodes last a week. (Tr. 373). Claimant's manic cycle is triggered by stress. (Tr. 374). In 1999, claimant experienced several episodes of depression. (Tr. 375). Claimant testified that the therapist discussed his problems with him, and the psychiatrist prescribed medications. (Tr. 376).

Claimant used a cane to assist in walking but then stopped using a cane in 1998. (Tr. 371). Claimant has problems sitting, because he experiences sharp pains in his right hip. (Tr. 376). Bending, standing in the same place for an hour, or walking for a long period of time, affects his right hip. (Tr. 376). Claimant testified that nothing relieves his pain. (Tr. 377). His medications, in particular Lorcet, cause frequent headaches two to three times a week, and give him diarrhea. Claimant does not sleep well at night, because he has problems positioning himself in order to achieve some relief. (Tr. 377). During the high cycle of his manic cycle, claimant does not sleep at all versus during his low cycle, he sleeps all the time. (Tr. 378). Picking up a gallon of milk and bending cause a burning pain in his left shoulder and arm but does not affect his hand. (Tr. 378). Claimant has little vision in his left eye, a problem since birth from nerve damage, but claimant noted this condition does not cause him problems. (Tr. 379).

As to his daily activities, claimant wakes up around 6:30 in the morning to help get the children ready for school. (Tr. 367-68). Claimant reads the paper until his youngest son wakes

up and then he takes care of his two-year old son during the day. (Tr. 368). Claimant does the laundry and shops, if at all, at night when the stores are not as crowded. (Tr. 369). Claimant testified that his son and wife do all of the yard work. (Tr. 369). Claimant testified that if he received a blow to the back, he could be paralyzed. (Tr. 374). Claimant testified that he avoids crowds, because he is afraid he will hurt someone if someone set him off. (Tr. 375). Claimant noted earlier in the week his wife lost her job, and he wanted to go to her place of employment and grab her boss by the throat. (Tr. 375). Claimant does not attend any of his children's school activities or sporting events, but his wife records the events so that he can watch the events on the VCR. (Tr. 369-70). Claimant spends most of his time reading the local paper and <u>Hot Rod</u> magazines. (Tr. 370). Friends come over to the house, and claimant tells them what work to perform on the car. Claimant visits with his parents once or twice a month. (Tr. 370). Claimant testified that he could lift a gallon of milk, but he never lifts his son. (Tr. 372). Claimant spends most of the day in the living room changing the Barney tapes for his son to watch, playing with his son, and taking care of his son's needs. (Tr. 372).

### 2. Testimony of Debra Ann Gore

Debra Ann Gore, claimant's wife, testified in response to questions posed by counsel and the ALJ. (Tr. 379-84). Mrs. Gore noted that in the last four years, claimant's become moody, hateful, belligerent, violent, and vicious. (Tr. 380). Last year, claimant grabbed her by the neck and threw her against the wall because he was mad. (Tr. 380). Mrs. Gore admitted that claimant has never been charged for assaultive behavior, but noted that claimant assaulted another man at a friend's house. (Tr. 383). Mrs. Gore explained during a depressive phase, claimant sleeps all day for twelve hours, does not bathe or take care of himself, or eat, and a neighbor helps take care of

their youngest son. (Tr. 380-81). Mrs. Gore testified that claimant experiences two depressive spells a month. (Tr. 381). During crying spells, claimant has told his wife he wants to kill himself, and she sought medical treatment for him at Mineral Area Program and Southeast Mental Health at his request. (Tr. 381). During a manic phase, claimant is mean, hateful, and vicious, and wants to hurt people. (Tr. 382). Mrs. Gore testified that claimant is so mean, no one visits him except the neighbor across the street. Mrs. Gore explained how claimant can no longer walk and hunt, and how he can barely make it to the mailbox and back without experiencing back pain. (Tr. 382). Mrs. Gore testified that she did not know where claimant gets the marijuana. (Tr. 384). Mrs. Gore testified that she works as an office manager. (Tr. 383).

### B. Hearing on September 27, 2000

#### 1. Claimant's Testimony

At the hearing on September 27, 2000, claimant testified in response to questions posed by the ALJ and counsel. (Tr. 386-96). The ALJ noted that after receiving the prior file, claimant's counsel wanted additional time to submit additional evidence. (Tr. 388). The new evidence included a Medical Source Statement of Ability to Do Work-Related Activities - Physical signed by Dr. Lum. (Tr. 389). Claimant's counsel argued that Dr. Lum's medical source statement is incompatible due to the combination of restrictions with either light or sedentary work activity. (Tr. 389). Counsel noted that claimant's weight restrictions are below light but above sedentary, and claimant is not limited in standing or walking. (Tr. 390). Counsel further noted that claimant's sitting restriction of three to four hours in an eight-hour workday are below the sedentary range. Claimant's reaching, handling, pushing, and pulling are affected by his physical impairmen,t and such limitations erode claimant's ability to perform jobs at the light and

sedentary level.  Counsel also noted that claimant's blindness in his left eye limits his ability to engage in any activity requiring use of his hands or fine eyesight, and in combination with his physical impairments, counsel opined that claimant is incapable of engaging in sustained work activity.  (Tr. 390).

Donna Yates of the Quality Health Care Service referred claimant to Dr. Lum for treatment.  (Tr. 391).  Claimant testified that he has seen Dr. Lum once a month for the last three to four months.  Dr. Lum treats claimant with epidurals to help reduce inflammation and to lubricate his spine to provide relief.  Claimant testified that Dr. Lum has prescribed arthritis medication and increased his pain medications to relieve the arthritis in his shoulders and lower back.  Dr. Lum injected the first epidural one month earlier, and has scheduled two more epidurals in the series of treatment.  Claimant testified that the epidural injection provided relief from his pain for one week.  (Tr. 391).  Dr. Lum explained to claimant the series of epidural injections, in addition to the medications and physical therapy treatment, are a trial by error treatment to provide relief from pain.  (Tr. 392).  Claimant testified that Dr. Lum has never proposed surgery, and other doctors have indicated that he is not a candidate for surgery because of his degenerate disc disease.  Claimant indicated that he has to schedule the next two epidural treatments. Claimant testified that Dr. Lum is trying to locate a psychiatrist in the area who will accept Medicaid, but he has not been successful to date.  Dr. Lum wants claimant to see a psychiatrist for treatment of his bipolar disorder.  Claimant testified that he has received medical treatment for his bipolar disorder in the past.  (Tr. 392).  Claimant testified that he is not under care of a physician for his bipolar disorder, because he questions seeing the doctor for five to ten minutes and as treatment, the doctor wants to prescribe medications.  (Tr. 393).  Claimant testified that he has

been treated by a psychiatrist at BJC as well as a therapist, and he last received treatment was in December, 1999. (Tr. 393). Claimant stopped seeing the psychiatrist not because of problems with medical insurance, but because he became upset with the psychiatrist when the doctor could not give him a reason why he has so many problems with his temper and controlling his anger. (Tr. 394). Part of claimant's frustration stems from his pain in his shoulders and back with no relief provided by the pain or arthritis medications. (Tr. 394). Dr. Lum accepts Medicaid, the only medical insurance claimant has had for the last four years. (Tr. 395).

### C. Hearing on February 20, 2002

#### 1. Claimant's Testimony

At the hearing on February 20, 2002, after remand by the Appeals Council to obtain vocational expert opinion regarding the extent claimant's limitations, claimant testified in response to questions posed by the ALJ and counsel. (Tr.397- 424). At the time of the hearing, claimant was forty-six years of age. (Tr. 402). Claimant lives in a house with his wife and their three children, ages sixteen, nine, and four. (Tr. 402). Claimant's wife drove him to the hearing because of lack of concentration due to his pain and muscle spasms in his right leg . (Tr. 402-03). Claimant testified that he made the hour and fifteen minute drive without having to stop. (Tr. 403). Claimant testified that he has had Medicaid coverage for five years. (Tr. 415).

Claimant last worked in 1996 as a mechanic for two and one half years at Mayberry's Auto Repair in Bismarck, Missouri. (Tr. 403). In that capacity, claimant performed engine swap outs and engine rebuilds. (Tr. 404). Claimant testified that he learned how to provide full maintenance over the years. Claimant testified that he could no longer work, because he had problems picking things up and bending over. (Tr. 404). In response to the ALJ's query

regarding no record of his employment, claimant admitted that his employer paid him in cash. (Tr. 406). Before working as a mechanic, claimant worked at Wal-Mart for three years as a night stocker. Claimant left that position, because he did not like working at Wal-Mart due to the disorganization of the management. (Tr. 404). Prior to that position, claimant worked at Georgia Mode, Incorporated and built custom glass showcases. (Tr. 405).

Claimant testified that he has neither worked since 1996 nor looked for any type of work, because he would be unable to work at a job most of the time. (Tr. 406). As to his daily activities, claimant testified that he wakes up around 6:30, dresses himself, and takes his medications. (Tr. 406-07, 413). Claimant sometimes has problems getting out of the shower. (Tr. 415). Claimant testified that he sweeps the floor and occasionally vacuums, but he does not do the laundry, cook, or shop. (Tr. 407, 413). Claimant testified that he has not done any yard work for a year. (Tr. 407). Claimant spends most of his time at home but drives to his appointments with Dr. Lum, a doctor of osteopathy. (Tr. 407-08). On occasion, claimant goes out to eat at Catfish Cabin. (Tr. 411). Claimant testified that he spends most of his time reading Hot Rod magazines. (Tr. 411). Claimant spends six hours a day lying on the couch or in bed because of the sharp pain in his groin area lasting two to three hours or all day. (Tr. 418). Claimant does not attend any of the children's school functions or other activities. (Tr. 412). Claimant testified that he used to use a cane to assist in walking because of his limp. (Tr. 413). Claimant goes to bed between 1:00 and 2:00 in the morning but does not nap during the day. (Tr. 414). Claimant smokes a half a pack of cigarettes a day but is trying to quit. (Tr. 414).

Dr. Lum has not referred claimant to another specialist for treatment. (Tr. 408). Claimant testified that Dr. Lum would not recommend surgery until he started to have multiple numb spots

on his body. (Tr. 415). Claimant has one numb spot on his right hip, and he has monthly steroid

pain injections. (Tr. 416). After the last steroid injection, claimant ended up in bed for almost

eight weeks. (Tr. 419). Claimant last received a monthly Depo-Medrol injection for pain on

February 8, 2002. (Tr. 419). Claimant testified that he has received the Depo-Medrol injections

for a year. (Tr. 420). Dr. Lum encourages claimant to do the exercises he received from physical

therapy. Claimant testified that he lives on twelve acres, and he walks to the barn for exercise.

Claimant testified that Dr. Lum has instructed him not to bend, stoop, lift, or twist. (Tr. 420).

Claimant receives medical treatment by Dr. Lum once a month. (Tr. 421). Claimant admitted

that Dr. Lum's treatment had reduced his pain level to the point where he can tolerate the pain.

Claimant has benefitted from Dr. Lum's treatment. (Tr. 421). Claimant testified that he takes

Tylox three times a day for pain, Methocarbamol three times a day for muscle spasms, Mobic

once a day for arthritis, Norvasc once a day for blood pressure, and a medication once a day for

high cholesterol. (Tr. 408-09). Claimant testified that the medications cause him to be

constipated, but he does not take any medication for the constipation. (Tr. 409). Claimant

obtains his medications from Medicaid in Desloge. Claimant declined medication for his mood,

because the doctor did not push the issue of medication. (Tr. 409). Claimant testified that no

other doctor has suggested any type of treatment for depression. (Tr. 410). Claimant testified

that he had been treated for depression by the Veteran's Administration, Dr. Menez, Dr. Koonz,

and Dr. Herath, and he last received treatment three years earlier, because he thought the doctors

"were a bunch of lunatics" and "educated idiots." (Tr. 410). Claimant testified that he stopped

going to the doctors, because he did not benefit from their course of treatment. (Tr. 410, 417-

18).

- 11 -

Claimant testified that he hurts more and has problems controlling his right leg. (Tr. 422). Claimant also has problems with the upper part of his spine and his shoulders. Picking up a gallon of milk causes claimant to experience burning pain. Claimant testified that Dr. Lum has indicated that his problems will become progressively worse and that one day, he will be in a wheelchair. (Tr. 422).

During the hearing, the ALJ observed how claimant had been up and down and leaning forward and back. (Tr. 422). Claimant explained that he changed positions because moving around helps his pain. (Tr. 422).

### D. Testimony of Vocational Expert

Vocational Expert Stephan Dolan, M.A., a Certified Rehabilitation Counselor, provided written responses to the ALJ's written interrogatory questions. (Tr. 308-11, 312-18).

The ALJ asked Mr. Dolan to assume that

The claimant is a 47 year old male with a high school education. Due to his chronic musckuloskeletal pain the claimant is limited to lifting 10# occasionally for a total of about 1 hour in an 8 hour work day[sic]. He can stand and walk without limitation. He is able to sit for a maximum of 45 minutes at onetime but can only sit for a maximum of 4 hours in an 8 hour workday. He can balance, stoop, crouch, crawl, kneel for a maximum of 20 minutes at a time. He must avoid repetitive reaching and pulling motions away from his body with upper extremities. He has no manipulative limitations. He must avoid repetitive pushing and pulling with his lower extremities.

(Tr. 309). Mr. Dolan opined that the restrictions listed in the hypothetical would prohibit claimant from performing any of his past relevant work and from transferring his skills. (Tr. 314). Mr. Dolan further opined that claimant could perform other work available in the economy such as a night watchman, receptionist, or a telephone solicitor. (Tr. 314).

Claimant's counsel requested supplemental interrogatory questions be submitted to the

vocational expert for his consideration.  (Tr. 322-23).  In particular, counsel requested that ALJ

to assume claimant's judgment, concentration, reliability, and ability to follow instructions were

"altered secondary to medication," and then opine whether claimant would be able to perform the

jobs he previously cited.  (Tr. 323).  Counsel also asked the ALJ whether claimant be able to

perform any of the jobs cited by him, if "claimant was required to lay down on more than one (1)

occasion during the eight (8) hour work day[sic] because it was the only way he could relieve

symptoms of discomfort."  (Tr. 323).  The ALJ submitted the additional questions to the

vocational expert who provided supplemental responses.  (Tr. 324-25, 326).  The ALJ forwarded

a copy of the additional responses to claimant's counsel (Tr. 327-28).

### 3.  Forms Completed by Claimant

In the Report of Contact, claimant's wife reported that claimant's hobby to be working on

a 1963 Impala and driving to a friend's house and visiting for thirty minutes.  (Tr. 93).  In the Pain

Questionnaire dated February 28, 2003, claimant reported experiencing pain every waking

moment and problems sleeping more than four hours at night.  (Tr. 64).  When experiencing

severe pain, claimant takes Lortab which helps take off the edge and sleep at night.  (Tr. 64).

## III.     Medical Records

The MRI of October 3, 1995, revealed mild osteoarthritic changes on a degenerative basis

of the lumbar spine and spina bifida of the first sacral segment.  (Tr. 106).

The MRI of claimant's lumbar spine on December 26, 1995, revealed spina bifida occulta

and a slight retrolisthesis of L4 and L5.  (Tr. 107).

On May 16, 1997, Donna Yates, a RNCS at Quality Care, Inc., evaluated claimant for

back pain.  (Tr. 109).  Claimant reported that he has a disability due to his back pain and

significant arthritis of the spine and is looking for a health care provider closer to home. Claimant reported that other medical providers have advised him not to lift more than six pounds. (Tr. 109). Claimant admitted he is not currently taking any medication for back pain. Claimant reported a past psychological evaluation, a hard to control violent temper, and uncontrollable angry outbursts. (Tr. 109-10). As treatment for his chronic low back pain, Ms. Yates gave claimant samples of Ultram to relieve the severe pain. (Tr. 111).

On June 18, 1997, claimant returned for treatment of his continued right shoulder pain and reported no relief from either Tylenol or the Ultram prescription. (Tr. 117). Claimant also reported more difficulty in controlling his temper and greater mood swings. Ms. Yates changed claimant's pain medication from Tylenol to Lorcet and suggested claimant consult a psychiatrist. When claimant agreed, Ms. Yates scheduled an appointment the next day with Dr. Jimenez. (Tr. 117).

On June 19, 1997, Dr. Jose Jimenez diagnosed claimant with depression and anxiety and prescribed Prozac, Elavil, and Depakote. (Tr. 124). Claimant reported having a bad temper all of his life but his temper becoming worse and experiencing mood swings. (Tr. 124). In a follow-up visit on July 3, 1997, claimant reported feeling okay. (Tr. 125). Dr. Jimenez noted that claimant is tolerating his medications well and observed no manic depressed behavior on medications. Dr. Jimenez continued claimant's medicine regime. (Tr. 125). On August 22, 1997, Dr. Jimenez noted minimal progress and continued claimant's medicine regime. (Tr. 126).

In a follow-up visit on July 2, 1997, claimant reported seeing psychiatrist and taking medications, Elavil, Prozac, and Depakote, as prescribed. (Tr. 116). Claimant reported improvement in mood swings and depression. Claimant reported taking Lorcet once or twice a

week for significant back pain and receiving relief from the Lorcet. Ms. Yates directed claimant to continue taking Lorcet for pain and seeing Dr. Jimenez. (Tr. 116). On September 10, 1997, claimant reported continued problems with low back pain and frequent muscle spasms. (Tr. 115). Ms. Yates refilled claimant's Robaxin and Lorcet prescriptions. (Tr. 115).

In a follow-up visit on September 19,1997, claimant reported feeling less depressed to Dr. Jimenez. (Tr. 126). Dr. Jimenez found claimant's progress to be fair and continued his medications and scheduled him for a return visit in eight weeks. (Tr. 126). Claimant returned on October 10, 1997, and blamed the medications for his depression and anxiety. (Tr. 127). Dr. Jimenez opined that claimant has not progressed and recommended that claimant should see another psychiatrist, Dr. Herath. (Tr. 127).

On October 13, 1997, claimant returned seeking a physical for the Division of Family Services. (Tr. 114). Claimant reported being on disability for three years and needing a reevaluation. (Tr. 114). Ms. Yates noted claimant's chronic lumbar pain. (Tr. 114).

In the initial Individual Treatment Plan at Park Hills Mental Health Services dated October 27, 1997, claimant reported no longer having a psychiatrist or needing medications, because he has problems controlling his rage and sleeping at night. (Tr. 129, 131). Claimant's diagnosis included bipolar disorder. (Tr. 129). Claimant reported a history of lacking faith in doctors. (Tr. 130). The treating doctor opined that claimant's anger will be controlled in part by sleeping four to five hours as exhibited by claimant reporting no rage for a week after improved sleep patterns. (Tr. 130). Claimant reported being off psychiatric medications for over two weeks. (Tr. 132). Claimant reported marijuana relieving his pain and decreasing his rage. (Tr. 133). Claimant listed ulcers, osteoarthritis, degenerate disc disease, two bulging discs, and chronic back pain as his

medical history. (Tr. 133). Claimant reported being the childcare provider for his two children and hoping to move out of his parents' house when he receives disability. (Tr. 134). The interviewer noted that claimant ambulates with a cane. (Tr. 136). The interviewer listed bipolar disorder and disc disorder as claimant's preliminary diagnosis and projected six months as the length of treatment needed. (Tr. 137).

On December 17, 1997, claimant returned for treatment of his chronic back pain after falling backwards in a chair causing more significant pain. (Tr. 113). Ms. Yates referred claimant to a neurologist for an evaluation and refilled his Robaxin prescription. (Tr. 113). In a follow-up visit on December 31, 1997, claimant reported trouble with chronic back pain. (Tr. 112). Ms. Yates prescribed Lorcet Plus and Robaxin. (Tr. 112).

On January 12, 1998, claimant was voluntarily admitted to Southeast Missouri Mental Health Center complaining of major depression and reporting being at the end of his road. (Tr. 219, 221). Claimant reported daily marijuana use, smoking ten joints, and trying methamphetamine for the first time two days earlier. (Tr. 223, 225). Dr. Nimmagadda discharged claimant on January 13, 1998, prescribed Lithium, Lorcet, Trazodone, and Cimetidene, and scheduled a follow-up visit with Dr. Coons on January 26, 1998. (Tr. 221-22). Dr. Nimmagadda discharge diagnosis included mood disorder, marijuana and methamphetamine abuse, and personality disorder. (Tr. 226).

On April 20, 1998, claimant returned for treatment of his chronic back pain. (Tr. 118). Ms. Yates noted that claimant ambulates with a cane. Ms. Yates refilled claimant's Lorcet prescription and prescribed Entex LA for allergic rhinitis. (Tr. 118). In a follow-up visit on June 3, 1998, claimant reported back and neck discomfort but admitted to brush-hogging over two

acres. (Tr. 119). Ms. Yates noted that claimant's depression is treated by Dr. Coons who has prescribed Lithium (Tr. 120).

On August 4, 1998, claimant was voluntarily admitted for psychiatric services to the Stress Behavioral Medical Unit at Mineral Area Regional Medical Center. (Tr. 159). Claimant reported having violent thoughts and hallucinations. (Tr. 158). Claimant reported using cannabis on a daily basis claiming it relaxes him. (Tr. 156). Dr. Herath noted that he continued Risperdal and Lithium during claimant's hospitalization and added Zoloft in the morning and Elavil at bedtime. Dr. Herath opined that claimant responded fairly well to the combined use of these psychotropics. (Tr. 156). Dr. Roberts noted during claimant's physical examination, some paravertebral muscle spasm with some restrictions in his lumbar area. (Tr. 160). In the diagnostic discharge, Dr. Herath opined claimant to have major depression, cannabis abuse, chronic lumbosacral disease, and mild to moderate stressors. (Tr. 157). Dr. Herath prescribed Lithobid, Risperdal, Elavil, Zoloft, and Tagamet as claimant's medicine regime at the time of discharge, and directed claimant to seek follow-up treatment with Dr. Coons. (Tr. 157).

On January 21, 1999, Dr. John Coons treated claimant's bipolar disorder and depression symptoms. (Tr. 138). Claimant reported progressive dysphoria with continued social withdrawal, decreased activity, and increased problems with insomnia. Dr. Coons increased claimant's Zoloft prescription and continued Lithium and prescribed Doxepin for insomnia. (Tr. 138). Claimant saw Jill Wolk, a MSW,[3] at BJC Behavioral Health Services, for therapy on January 25, 1999. (Tr. 139). Ms. Wolk noted that claimant continued to use drugs and has a sad affect and hopeless content. (Tr. 139). During a therapy session on February 22, 1999, Ms. Wolk noted that

_____

[3]MSW is the abbreviation for master of social work. National Institute of Health, Medline Plus, at http://www.nlm.nih.gov/medlinplus/merriam-webster.com.

- 17 -

claimant has fewer angry outbursts as a result of therapy and medications. (Tr. 140). In a follow-up visit with Dr. Coons, claimant reported continued mood swings and use of marijuana, and no major temper outbursts. (Tr. 141). Dr. Coons continued claimant's Zoloft and Lithium prescriptions and added Lamictal and Vistaril to the medicine regime. (Tr. 141). On April 19, 1999, claimant failed to keep his scheduled follow-up visit with Dr. Coons. (Tr. 142). In a therapy session on April 21, 1999, claimant reported stopping all medications except Lithium, because he wants the disability hearing officer "to see how I really am." (Tr. 143). Ms. Wolk noted that claimant laughed with frequency and exhibited grandiosity. Ms. Wolk opined that she needs to be prepared to intervene inasmuch as a crisis is due to claimant's medicine noncompliance. (Tr. 143). On May 12, 1999, claimant failed to keep his scheduled appointment with Dr. Coons. (Tr. 144). Claimant called Ms. Wolk on July 14, 1999, to schedule an appointment and discuss his current concerns and symptoms. (Tr. 145). Claimant reported stopping all medications and being manic more than depressed. Claimant requested switching doctors, because he has a better rapport with Dr. Herath. (Tr. 145). On August 11, 1999, claimant returned for a therapy session after a four-month recess imposed by claimant. (Tr. 146). Claimant decided to stop taking all medications so he could "see what the real Dale was like." (Tr. 146). Ms. Wolk noted that claimant remains angry and volatile. (Tr. 146).

On August 11, 1999 during a follow-up visit with Ms. Yates, claimant returned complaining of significant low back pain. (Tr.121). Claimant reported discontinuing all of his medications, including pain and psychiatric medications and muscle relaxers, since his last office visit. Claimant reported anger outbursts and indicated he would try to schedule an appointment with Dr. Jimenez. Ms. Yates noted that claimant has a problem rising from the chair due to his

back pain. Ms. Yates prescribed Celebrex and ordered x-ray of lumbar spine. (Tr. 121). In the return visit after the CT of claimant's spine, Ms. Yates noted the scan showed old avulsion at L5-S1 with no significant new injury. (Tr. 122). Ms. Yates opined that although she recommended a MRI, claimant's previous MRI essentially showed the same result. Ms. Yates refilled claimant's Celebrex prescription. (Tr. 122).

The lumbar spine oblique completed on August 11, 1999, revealed partially lumbarized S1 segment and evidence of L5-S1 degenerative disc disease with mild retrolithiasis. (Tr. 149). A MRI of claimant's lower spine revealed lower lumbar spondylosis with L4-5 spondylolisthesis and a small central herniation. (Tr. 150).

On August 19, 1999, Dr. Herath treated claimant. (Tr. 147). Claimant reported stopping all medications and doing okay and staying out of trouble. Claimant's mood swings have worsened, and his sleep compromised. Claimant reported Lithium helping and agreed to restart his Lithium prescription. (Tr. 147). On September 22, 1999, during a follow-up visit, claimant reported having a bad day and continued mood swings. (Tr. 148).

On September 20, 1999, claimant reported taking the Lithium medication to Ms. Wolk during therapy. (Tr. 151). Ms Wolk reported claimant to be in a pleasant mood. (Tr. 151).

The CT of claimant's lumbar spine on September 23, 1999, revealed a suggestion of old avulsion right sided posterior intravertebral joint at L5-S1, and the radiologist recommended a MRI for further evaluation. (Tr. 152).

On October 22, 1999, Ms. Wolk telephoned claimant after he failed to keep his scheduled therapy appointment earlier in the week. (Tr. 153). Claimant expressed his dissatisfaction with doctors. (Tr. 153). Claimant returned for therapy on November 1, 1999, and Ms. Wolk noted

that claimant had returned to his threatening demeanor and continued to use street drugs. (Tr. 154, 209). Ms. Wolk noted that there has not been any significant change in his mood stability and determined to discharge claimant from therapy before the new year. (Tr. 154, 209).

On November 2, 1999, in follow-up visit with Ms. Yates, claimant reported neck pain and a known history of degenerative disc disease of the lumbar spine. (Tr. 204). Ms. Yates continued claimant's Celebrex prescription and prescribed Fleril for treatment of claimant's spine. (Tr. 204). In the return visit on November 10, 1999, claimant reported an abscessed tooth, and Ms. Yates prescribed Pen-Vk pursuant to a telephone consultation with Dr. Bramhall. (Tr. 203).

On November 9, 1999, Dr. Herath treated claimant for his depression. (Tr. 207). Claimant reported that he was having a bad time, and his medications were not working. (Tr. 210). Claimant reported sleeping fair to poor, and his appetite being good. (Tr. 210). Claimant failed to keep his next two scheduled appointments with Dr. Herath on December 8, 1999, and February 3, 2000. (Tr. 207). On December 1, 1999, claimant failed to show up for his scheduled therapy session with Ms. Wolk. (Tr. 208).

On December 1, 1999, Dr. Alywin Kluutz performed a disability determination evaluation of claimant. (Tr. 166-69). Claimant reported right thigh pain, right hip pain, and right knee pain radiating into his right foot. (Tr. 166). Claimant reported a history of back pain stemming from injury while working as a mechanic. Claimant reported that his back pain has worsened over time. Claimant has difficulty bending and lifting. Walking, sitting and standing aggravate his back pain. Claimant reported how frequently changing positions provided relief. Claimant also reported a history of bipolar disorder with problems in the last two years but medications helping. (Tr. 166). After examining claimant, Dr. Kluutz found claimant to have a full range of motion of the upper

and lower extremities and his neck in all directions. (Tr. 167). Examination of claimant's back revealed tenderness to pressure and palpation over the right lower lumbosacral region, and no muscle spasms. (Tr. 168). Forward flexion of claimant's back was limited but lateral flexion was full and equal. Dr. Kluutz noted that claimant was able to get on and off the examination table without difficulty, and he exhibited a normal gait without a limp. Dr. Kluutz found claimant to have a good range of motion of his right lower extremity. Dr. Kluutz found claimant's medications have provided some improvement. Dr. Kluutz opined that claimant would have "tend to have difficulty with tasks and activities that involve prolonged walking, prolonged standing, twisting, climbing, bending, lifting, stooping, and squatting." (Tr. 168). Dr. Kluutz opined that claimant's bipolar disorder could cause him "to have difficulty with tasks and activities that involve stressful situations" especially if working around large groups of people. In addition, activities requiring mental alertness, concentration, and attention to detail could be difficult for claimant. (Tr. 168). Dr. Kluutz noted that claimant might have difficulty with tasks and activities requiring precise binocular vision and depth perception, and he should be protected from hazards that might cause injury or irritation to his right eye. (Tr. 169). Dr. Kluutz determined claimant's weight could cause difficulty with strenuous tasks and activities in general. Dr. Kluutz opined that claimant would have little difficulty with tasks and activities involving flexible sitting, limited standing, limited walking, limited lifting, limited carrying, handling objects, hearing, speaking, and limited traveling. (Tr. 169).

On December 1, 1999, Dr. Marjorie Kuenz, Ph.D., performed a psychological consultation. (Tr. 173-76). Dr. Kuenz diagnosed claimant with bipolar disorder by history and assessed his current GAF at 73. (Tr. 175). Dr. Kuenz determined claimant's math skills to be

sufficient to manage his finances. (Tr. 175). Dr. Kuenz determined claimant able to understand, remember, and follow instructions. (Tr. 176). Dr. Kuenz opined that claimant's ability to sustain concentration and persistence in tasks would be limited by his depressive symptoms, but nonetheless, she found his concentration and persistence to be within near-normal limits. Dr. Kuenz opined that claimant's social skills are adequate, and his adaptive skills to be improving with medication and psychotherapy. (Tr. 176).

In the Physical Residual Functional Capacity Assessment completed on January 3, 2000, Paula Niswonger, a counselor at Disability Determinations Services, listed degenerative changes to lumbar spine as claimant's primary diagnosis and leg, knee, and hip pain as his secondary diagnosis. (Tr. 178). Ms. Niswonger indicated that claimant's exertional limitations included that he could occasionally lift fifty pounds; could frequently lift twenty-five pounds; could stand, walk or sit about six hours in an eight-hour work day; and was unlimited, other than as noted, in pushing and pulling. (Tr. 179). In particular, she noted that objective evidence of claimant's lumbar spine revealed spondylosis and small central herniation, and decreased range of motion. Ms. Niswonger indicated that claimant's postural limitations included that he could frequently climb, balance, kneel, and crawl and occasionally stoop and crouch. (Tr. 180). In support, Ms. Niswonger cited the same objective evidence in support of claimant's exertional limitations. (Tr. 180). Ms. Niswonger further indicated that claimant has no manipulative, visual, or communicative limitations. (Tr. 181-82). The only environmental limitation imposed by Ms. Niswonger would be the need for claimant to avoid vibration because of his back pain and degenerative changes to his lumbar spine. (Tr. 182). Ms. Niswonger concluded that claimant's symptoms are partially credible based on the objective evidence substantiating an impairment,

including evidence showing claimant currently takes pain medication and has received treatment for back pain.  (Tr. 183).  Nonetheless, Ms. Niswonger determined the severity of the impairment is disproportionate to the expected severity citing in support his daily activities, his decision to discontinue pain medications, and the objective medical evidence in the record.  (Tr. 183).  As additional support, Ms. Niswonger noted how the consultative examiner found claimant should have "little difficulty with tasks and activities that involve flexible sitting, limited standing, limited walking, limited lifting, limited carrying, handling objects, hearing, speaking, and limited traveling."  (Tr. 185).  Moreover, Ms. Niswonger that the consultative examiner's findings were consistent with the other medical evidence in the record, and thus should be given significant weight.  (Tr. 185).

In the Mental Residual Functional Capacity Assessment, completed by Drs. Marsha Toll and Joan Singer, both Ph.Ds, they determined that claimant's ability to understand and remember detailed instructions and to maintain attention and concentration for extended periods was not significantly to moderately limited.  (Tr. 187).  Claimant alleged disability due to bipolar disorder and depression.  (Tr. 189).  In particular, the doctors opined that although claimant has a history of depression and bipolar disorder, these impairments have not impaired his ability to function on a daily basis and take care of his children.  (Tr. 189).  The doctors found claimant's feelings of anger and rage to have decreased with therapy and medication. The doctors further noted claimant's noncompliance with medications and therapy.  The doctors also noted that claimant's treatment notes show progress with treatment, and claimant's functioning improving with medications.  (Tr. 189).  The doctors also questioned how claimant's admitted marijuana use may impact the therapeutic benefit of his medications.  (Tr. 190).  With respect to claimant's

credibility, the doctors opined that claimant may be overstating his psychological limitations. The doctors concluded that claimant has the ability to understand and execute instructions and work in a less demanding environment. (Tr. 190).

In the Psychiatric Review Technique completed Drs. Toll and Singer on January 3 and 4, 2000, the doctors determined that a residual functional capacity assessment should be completed. (Tr. 191). The doctors found claimant to have an affective disorder with symptoms including disturbance of mood, sleep disturbance, and inflated self-esteem. (Tr. 191, 194). The doctors also noted that claimant has a substance addiction disorder. (Tr. 197). The doctors found a degree of functional limitation with respect to claimant's ability to maintain social functioning but found either no or a slight degree of functional limitation with respect to claimant's activities of daily living, and his ability to concentrate and persist in completing tasks in a timely manner. (Tr. 198).

On January 24, 2000, Ms. Yates treated claimant's sinus congestion, abscessed tooth, and significant back pain. (Tr. 201, 232). Ms. Yates noted that the CT of claimant's spine showed degenerative disc disease. Ms. Yates recommended a MRI be performed by a radiologist. (Tr. 201, 232). Claimant requested a MRI of his entire spine be performed at that time. (Tr. 201-02, 232-33). Pursuant to a telephone consultation with Dr. Bramhall, Ms. Yates noted that he recommended a MRI only of claimant's lumbar spine. (Tr. 202, 233).

On March 17, 2000, the MRI ordered by Ms. Yates revealed no evidence of disc herniation changes and retrolisthesis L5 on S1. (Tr. 217, 234).

On March 23, 2000, Dr. Scott VanNess, D.O., examined claimant for ongoing left shoulder pain. (Tr. 214, 239). Claimant reported no numbness in the left shoulder but problems

with the shoulder giving out in certain positions. Examination revealed palpable coracoacrominal impingement and internal impingement of his left shoulder. Dr. VanNess diagnosed claimant with a probable labral tear with subtle instability of the left shoulder and recommended a MRI to evaluate the labral disruption. (Tr. 214, 239). An x-ray revealed no evidence of a fracture, swelling, or calcification, and the radiologist determined the results to be negative. (Tr. 216, 241). A MRI of claimant's left shoulder performed on April 3, 2000, revealed anatomical variant of some slightly shallow glenoid fossa, but was otherwise negative. (Tr. 213, 235, 242).

In a follow-up visit to monitor his degenerative joint disease, claimant reported having Dr. VanNess' evaluate his shoulder pain. (Tr. 236). Ms. Yates noted that claimant's MRI results were essentially normal, and his continued tenderness to palpation of lumbar/sacral, paravertebral region. Ms. Yates refilled claimant's Lorcet prescription. (Tr. 236).

On April 20, 2000 in a follow-up visit, Dr. VanNess diagnosed claimant with chronic impingement of the left shoulder based on the MRI results showing no sign of rotator cuff tear. (Tr. 212, 243). Dr. VanNess recommended that claimant continue a home exercise program to decrease symptomatology in the area of the shoulder. After learning of the diagnosis, claimant became belligerent, made inappropriate comments, and used foul language. Dr. VanNess discharged claimant from his practice due to his inappropriate behavior and explained to claimant that he would no longer treat him. (Tr. 212, 243).

On June 12, 2000, claimant sought treatment for shoulder, neck, and right hip pain from Dr. Laurence Lum, D.O. (Tr. 227). Claimant reported chronic hip and back pain. Claimant reported having been treated by Dr. VanNess. Claimant stated that he tries to stay active and walk daily. (Tr. 227). Examination revealed a good range of motion of claimant's cervical spine

and left shoulder, and claimant's extremities to be normal. (Tr. 228). Claimant's straight leg raising was slightly decreased on the right, but claimant had no radiculopathy. Dr. Lum noted that claimant's pinprick sensation, and gait were normal. Dr. Lum opined that most of claimant's symptoms were probably from degenerative disc disease. Dr. Lum prescribed DC Lorcet Plus and OxyContin with no refills and scheduled claimant for physical therapy. (Tr. 228). On July 13, 2000, claimant returned for follow-up treatment and reported pain in both shoulders and lower back. (Tr. 229). Dr. Lum noted that claimant has poor range of motion and pain in claimant's lower back and recommended administering an epidural. (Tr. 229). On August 14, 2000, claimant reported that the epidural helped his back pain. Dr. Lum noted claimant's history of bipolar disorder, and the poor range of motion in his back. (Tr. 230). Claimant reported that his Vioxx and pain pill prescriptions were working well, but the muscle relaxers not helping at all. (Tr. 231).

In an office visit on September 12, 2000, claimant reported recurrent lower back and bilateral shoulder pain and no relief from his Vioxx prescription. (Tr. 338). Claimant requested a refill of Lorcet. (Tr. 338). After a telephone consultation with Dr. Bramhall, Misty Shaw, RNCS, adjusted claimant's medication for pain control by refilling his Lorcet prescription. (Tr. 339).

On September 26, 2000, Dr. Lum completed a Medical Source Statement to Do Work Related Activities - Physical on behalf of claimant. (Tr. 244-46). Dr. Lum found that claimant can lift and/or carry a maximum of fifteen pounds occasionally and five pounds frequently. (Tr. 244). Dr. Lum determined claimant's standing and/or walking not to be impaired. Dr. Lum limited claimant's sitting to a total of three to fours hours in an eight-hour workday and thirty to forty-five minutes without interruption, because sitting for prolonged periods causes claimant to

have increased back pain. (Tr. 244). Dr. Lum found that claimant can never balance, stoop, crouch, kneel, or crawl, but occasionally could climb, and claimant could not tolerate these activities for more than fifteen to twenty minutes at a time. (Tr. 245). Dr. Lum opined that based on claimant's decreased range of motion in his lower back, he could not reach, handle, or push/pull, but his ability to feel, see, hear, and speak were not impaired. (Tr. 245). Dr. Lum further noted that claimant's shoulder and lower back pain makes him unable to move machinery due to his decreased ability to bend, stoop, or lift. (Tr. 246).

On October 23, 2000, claimant returned for treatment after having epidurals. (Tr. 340). Claimant reported more problems sitting but improvement in walking. Examination by Dr. Lum revealed tenderness in claimant's lumbar spine but a good range of motion. Dr. Lum refilled all of claimant's current medications and noted that claimant admitted to smoking marijuana before the office visit. (Tr. 340). On December 4, 2000, claimant returned for follow-up treatment. (Tr. 341). After examining claimant, Dr. Lum noted that claimant has a good range of motion of his musculoskeletal, and a negative straight leg raise test. Dr. Lum refilled claimant's Lorcet prescription. (Tr. 341). On January 5, 2001, claimant reported back pain with radicular symptoms and numbness in his right hip. (Tr. 343). Dr. Lum's examination revealed a poor range of motion and stiffness but a negative straight leg raising test and reflexes normal. Dr. Lum gave claimant a Depo-Medrol injection and continued his Vicodin prescription and opined that he would consider epidural blocks as treatment in the future. (Tr. 343). Claimant returned for a follow-up visit on March 2, 2001. Dr. Lum noted that claimant has a good range of motion with some stiffness. (Tr. 344). On April 9, 2001, Dr. Lum changed claimant's pain medications. (Tr. 345). Examination in a follow-up visit on May 22, 2001, revealed a poor range of motion and

stiffness. (Tr. 346). Dr. Lum gave claimant Depo-Medrol injection on that date and on June 19, 2001. (Tr. 346-47). Claimant returned complaining of lower back pain with radicular symptoms down to his hip and buttock region on August 30, 2001. (Tr. 348). Examination revealed a poor range of motion and stiffness. Dr. Lum administered a Depo-Medrol shot and increased claimant's Tylox prescription. (Tr. 348).

On September 5, 2001, Dr. Lum completed a Medical Source Statement of Ability to Do Work-Related Activities - Physical on behalf of claimant. (Tr. 332-34). Dr. Lum found that claimant can lift and/or carry less than ten pounds for less than one hour in an eight-hour workday. (Tr. 332). Dr. Lum determined claimant's standing and/or walking not to be impaired but limited his sitting to forty-five minutes at a time for a total of three to four hours in an eight-hour workday. (Tr. 332). Dr. Lum found that claimant can never balance, stoop, crouch, kneel, or crawl, but occasionally could climb, and claimant could not tolerate these activities for more than fifteen to twenty minutes at a time. (Tr. 333). Dr. Lum opined that based on claimant's decreased range of motion in his lower back, he could not reach, handle, or push/pull, but his ability to feel, see, hear, and speak were not impaired. (Tr. 333). Dr. Lum further noted that "[t]he patient suffers from chronic back pain- and is to avoid bending, lifting < 10lbs, squatting, or twisting to avoid disc herniation." (Tr. 334). On the same day, Dr. Lum completed a Medical Source Statement of Ability to Do Work Related Activities (Mental). (Tr. 335-36). Dr. Lum determined that claimant's ability to use judgment and maintain attention/concentration may be altered to a degree by his pain medication, but his ability to follow work rules, relate to coworkers, deal with the public, interact with supervisor, deal with work stress, and function independently were unlimited/very good. (Tr. 335). Dr. Lum further opined that claimant's

ability to understand, remember, and carry out complex or detailed job instructions may be only fair or altered due to his medications. (Tr. 336). Dr. Lum opined that claimant's ability to understand, remember, and carry out simple job instructions to be good. In particular, Dr. Lum noted that "memory and intellectual ability may be altered secondary to patient's pain medication." (Tr. 336). Dr. Lum noted how "patient on pain medication Tylox TID PRN and this may alter mental state." (Tr. 337).

On November 27, 2001, claimant returned for a follow-up visit after an epidural injection. (Tr. 349). Claimant reported pain from the epidural. Dr. Lum noted that claimant has a poor range of motion and stiffness. (Tr. 349). During the office visit on January 10, 2002, claimant reported going through a manic phase but not taking any medications and unwilling to take any medications. (Tr. 351). Examination revealed a good range of motion with no radiculopathy. Claimant refused a prescription mood stabilizer. (Tr. 351). On February 8, 2002, Dr. Lum noted that claimant's extremities were free of clubbing, cyanosis, and edema and refilled his current medications. (Tr. 352). In a form dated February 16, 2002, Dr. Lum indicated in the affirmative that claimant's condition is "at least as bad, if not worse, as you indicated in your assessment of September 2001." (Tr. 353).

## IV.    The ALJ's Decision

The ALJ found that claimant met the nondisability requirements for a period of disability, and is insured for benefits through December 31, 2001. (Tr. 29). The ALJ found that claimant has not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. 29). The ALJ found that the medical evidence establishes that claimant has a severe impairment of degenerative joint disease with retrolithiasis. (Tr. 30). The ALJ found that claimant's medically

determinable impairment does not meet or equal one of the listed impairments set forth Appendix 1, Subpart P, Regulations No. 4.  The ALJ found that claimant's allegations regarding his limitations are not totally credible.  The ALJ noted how he had carefully considered all of the medical opinions in the record regarding the severity of claimant's impairments.  The ALJ determined that claimant has no acquired work skills form any past relevant work transferable to other work he can perform.  The ALJ specifically found that claimant can occasionally lift ten pounds for a total of one hour in an eight-hour workday, stand and walk without limitation, sit for a maximum of forty-five minutes at one time but only for a total of four hours in an eight-hour workday.  The ALJ further determined that claimant can balance, stoop, crouch, crawl, and kneel for a maximum of twenty minutes at one time, and occasionally climb ramps and stairs.  The ALJ determined that claimant must avoid repetitive twisting movements, repetitive reaching and pulling motions away from his body with his upper extremities, and repetitive pushing and pulling with his lower extremities but no manipulative limitations.  The ALJ opined that claimant is unable to perform any of his past relevant work, but that claimant has the residual functional capacity to perform a significant range of light work.  The ALJ noted that claimant is a younger individual between the ages of forty-five and forty-nine with a high school education.  (Tr.19).

Considering claimant's age, education, and residual functional capacity, the ALJ opined based on Medical-Vocational Rule 202.21, claimant can perform a significant number of jobs in the national economy, such jobs include work as a night watchman, receptionist, and telephone solicitor with 7,400 jobs locally and 14,100 jobs in the State of Missouri.  (Tr. 30).  The ALJ thus concluded that claimant was not under a disability at any time through the date of his decision. (Tr. 31).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment,

the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is

not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the

claimant is capable of doing past relevant work. If the claimant can still perform past work, she is

not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is found incapable of performing other

work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

 Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." Id. The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

 In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

 1.    The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to
       exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the
       claimant's impairments.

6.     The testimony of vocational experts when required which
       is based upon a proper hypothetical question which sets forth the claimant's
       impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ failed to give controlling weight to the treating physician's

opinions and restrictions when determining his residual functional capacity. Claimant further

contends that the ALJ improperly made credibility determinations regarding his subjective

complaints of pain. Finally, claimant claims that the vocational expert's testimony was premised

upon an inadequate hypothetical question inasmuch as it failed to contain the restriction from Dr.

Lum regarding medications effecting his mental functioning.

A.          Weight Given to Dr. Lum's Opinions and Restrictions

Claimant contends that the ALJ erred by not giving appropriate weight to Dr. Lum's

opinions and restrictions when determining his residual functional capacity. See 20 C.F.R. §

404.1527(d)(2) (2005) (requiring the Commissioner to give controlling weight to the opinion of a

treating physician if "it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence"); Shontos v.

Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). When a treating source's opinion is not controlling, it is weighed by the same factors as any other medical opinion: the examining relationship, the treatment relationship, supporting explanations, consistency, specialization, and other factors. See 20 C.F.R. § 404.527(d). Claimant contends that the ALJ should have accorded more weight to Dr. Lum's opinions and restrictions inasmuch as Dr. Lum was his treating physician.

In the instant cause from June 12, 2000, through February 8, 2002, Dr. Lum treated claimant's chronic pain, degenerative joint disease, and osteoarthritis. A review of his treatment notes reveal that Dr. Lum never found claimant to have any severe functional limitations with respect to lifting, bending, and sitting until completing the Medical Source Statements of Ability to Do Work Related Activities (Physical) ("Medical Source Statements") on behalf of claimant on September 26, 2000, and on September 5, 2001. In his decision, the ALJ discussed Dr. Lum's restrictions set forth in the most recent Medical Source Statement and incorporated in part Dr. Lum's restrictions in his RFC determination. In accordance with the restrictions imposed by Dr. Lum, the ALJ found that claimant could occasionally lift ten pounds for a total of one hour during the workday, could sit for a maximum of forty-five minutes at a time for a total of four hours in a workday, and could balance, stoop, crouch, crawl, and kneel for a maximum of twenty minutes at a time and occasionally climb ramps and stairs. The ALJ found that claimant must avoid repetitive twisting movements and reaching and pulling motions away from his body with his upper extremities and repetitive pushing and pulling with his lower extremities.

Dr. Lum's opinions were based primarily on claimant's subjective complaints and were not supported by clinical and diagnostic techniques or objective medical evidence. Such findings were inconsistent with other evidence in the record. Cf. Holmstrom v. Massanari, 270 F.3d 715, 721

(8th Cir. 2001)(treating physician's vague and conclusory opinion is not entitled to deference);
see Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ's decision to discount or even
disregard the opinion of a treating physician will be upheld "where other medical assessments are
supported by better or more thorough medical evidence or where a treating physician renders
inconsistent opinions that undermined the credibility of such opinions")(citations and internal
quotation marks omitted).  Indeed, Dr. Lum's own treatment records do not contain clinical
evidence of a disabling condition during the relevant time period or any restrictions imposed by
Dr. Lum based on claimant's alleged inability to bend or stoop.  As noted by the ALJ, the
objective medical evidence included in Dr. Lum's own treatment notes showing no radiculopathy
or focal neurological deficit, and reporting negative straight leg raising and a good range of
motion.  Likewise, Dr. Lum's conservative treatment of claimant and the lack of functional
limitations previously imposed by him undermine the credibility of the opinions set forth in the
Medical Source Statements.  Indeed, Dr. Lum never opined that claimant is completely disabled
and unable to engage in all work or restricted his bending or stooping.  Dr. Lum also found
claimant to have a good to unlimited mental work capacity.  A review of the record shows no
substantive evidence to support Dr. Lum's specific restrictions.  Thus, the ALJ's determination
not to exclusively rely on Dr. Lum's restrictions as to claimant's functional limitations was not
improper. The substantial evidence on the whole record supports the ALJ's conclusion that Dr.
Lum's specific restrictions were not entitled to controlling weight.

    In the instant case, the ALJ determined to give Dr. Lum's opinions and restrictions neither
controlling weight nor much deference.  The ALJ gave good reasons for such determinations, and
such reasons are supported by substantial evidence on the record as a whole.

Moreover, the opinions contained in the Medical Source Statements, finding claimant has extremely severe functional limitations are inconsistent with and not supported by Dr. Lum's own treatment notes. Dr. Lum never imposed any limitations on claimant's bending and stooping during his course of treatment and never found any of claimant's limitations precluded him from being gainfully employed. The opinions set forth in the Medical Source Statements are conclusory, not based upon any clinical or laboratory diagnostic techniques, and are not supported by the evidence contained in the record as a whole. See Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995) (physician's conclusory statement without supporting evidence does not amount to substantial evidence of disability); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data). Thus, the ALJ did not err in according Dr. Lum's opinions and restrictions little weight. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

"The ALJ must determine a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the

"frequency, appropriateness, and independence of the activities must also be considered."  SSR 85-16.

   An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218.  In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole.  Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints.  The ALJ must consider all of the evidence presented, including the claimant's prior work record and observations by third parties and treating and examining physicians as to:

   1.   the claimant's daily activities;

   2.   the duration, frequency and intensity of the pain;

   3.   any precipitating and aggravating factors;

   4.   dosage, effectiveness and side effects of medication; and

   5.   any functional restrictions.

Polaski, 739 F.2d at 1322.  The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate

review." Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has

held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis

will be accepted as long as the opinion reflects acknowledgment and consideration of the factors

before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th

Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only

required to consider impairments he finds credible and supported by substantial evidence in

determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003)

("The ALJ properly limited his RFC determination to only the impairments and limitations he

found to be credible based on his evaluations of the entire record." )

The ALJ's determination of the claimant's RFC is supported by substantial evidence in the

record. As discussed, the ALJ's RFC incorporated in part some of Dr. Lum's restrictions in his

RFC determination. The ALJ noted that Dr. Lum's treatment notes reflect that claimant had no

radiculopathy or focal neurological deficit, good range of motion, and negative straight leg

raising. The ALJ opined that the medical record does not show that any physician imposed any

functional restrictions of the claimant. The ALJ also properly considered the Polaski factors in

concluding that "claimant's allegations as to disability remain not fully credible." (Tr. 27). The

ALJ listed facts from the claimant's hearing testimony regarding the Polaski factors that reflected

upon the claimant's ability to perform a significant range of light work such as his daily activities

of dressing, completing some household chores, reading, driving to doctors's appointments, and

exercising as recommended by Dr. Lum. Further, the ALJ pointed out other inconsistencies in the

record that tended to militate against claimant's credibility. Those included claimant's decision to

discontinue medications, his testimony in the hearing regarding his daily activities, the absence of

objective medical evidence of deterioration, the absence of any doctor finding claimant disabled or imposing any functional limitations, his failure to keep scheduled treatment appointments, and his daily marijuana use. (Tr. 277, 283). Based on the ALJ's analysis of the medical evidence and claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that the claimant retains an RFC to perform a significant range of light work. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Based on the ALJ's analysis of the medical evidence and the claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that the claimant retains a RFC to perform a significant range of light work.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf, 3 F.3d at 1213 (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.     Credibility Determination

Claimant argues that the ALJ failed to properly assess his credibility regarding his subjective complaints of pain.

The determination of claimant's credibility is for the Commissioner, and not the Court, to decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit claimant's complaints of pain solely because they are unsupported by objective medical evidence. Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Instead, the ALJ must also consider all of the evidence relating to the claimant's relevant work history, the absence of objective medical evidence to

support the complaints, and third party observations as to:

1. claimant's daily activities;

2. duration, frequency and intensity of the pain/condition;

3. dosage, effectiveness, and side effects of medication;

4. precipitating and aggravating factors; and

5. functional restrictions.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (stating factors from Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The undersigned recognizes that pain itself may be disabling. See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994). However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826. While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell, 242 F.3d at 796; Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); see also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the Polaski factors but then

discredits a claimant's complaints for good reason, his decision should be upheld. <u>Browning v.</u> <u>Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each <u>Polaski</u> factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000); <u>see also</u> <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996). The ALJ's credibility findings are entitled to deference. <u>See</u> <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination).

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating claimant's subjective complaints of constant pain, the control of claimant's pain with medications, claimant's failure to keep scheduled appointments and to take medications as prescribed, claimant's disregard for treatment recommendations, and the testimony adduced at the hearings, including claimant's testimony and demeanor during the hearings. <u>See</u> <u>Gray v. Apfel</u>, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. <u>See</u> <u>Stephens v. Shalala</u>, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints

was an important factor in evaluating the credibility of her testimony and of her complaints).  The

ALJ then addressed several inconsistencies in the record to support his conclusion that claimant's

complaints of constant pain were not credible.

Specifically, the ALJ noted that no treating physician stated that claimant was

disabled or unable to work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant

that no examining physician submitted medical conclusion that claimant is disabled or unable to

work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987)

(examining physician's failure to find disability a factor in discrediting subjective complaints).  In

addition, the ALJ noted that no physician had ever made any medically necessary restrictions,

restrictions on his daily activities, or functional or physical limitations.  Indeed, the ALJ noted

how claimant's unimpressive work record detracts from his credibility.  Pearsall v. Massanari, 274

F.3d 1211, 1218 (8th Cir. 2001) (lack of work history may indicate a lack of motivation to work

rather than lack of ability); Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (claimant's

credibility is lessened by a poor work history).  The ALJ also noted how claimant did not seek

regular and sustained treatment for any of his impairments as demonstrated by his failure to

pursue his follow-up epidural injections.  See  Johnson v. Chater, 108 F.3d 942, 947 (8th Cir.

1997) (determining that failing to seek treatment was inconsistent with claimant's subjective

complaints of disabling pain); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure

to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d

630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of

disabling condition).  Likewise, the medical record is devoid of any evidence showing that

claimant's condition had deteriorated or required aggressive medical treatment.  Chamberlain v.

Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)( lack of ongoing treatment is inconsistent with complaints of disabling condition). The ALJ noted that there is no medical evidence showing that claimant required surgery. Indeed, the ALJ stated that despite claimant's testimony regarding constant pain, the medical evidence shows that claimant's pain was controlled with medication and epidural injections. Patrick v. Barnhart, 323 F.3d 592, 596 (8th Cir. 2003); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.")

The ALJ noted that claimant reported to Dr. Lum that the epidural injections and the prescribed medications helped control his pain. Likewise, the ALJ stated the record failed to reveal claimant's medication not to be effective. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). Claimant's lack of consistent medical treatment for his constant back pain was inconsistent with claimant's complaints of disabling pain. The ALJ also cited claimant's uncooperative attitude and disregard for treatment recommendations as additional factors detracting from his credibility. In particular, the ALJ cited how claimant discontinued his medication intentionally in an attempt to make his condition appear worse for disability purposes. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003) (noting that an ALJ may discount claimant's allegations if there is evidence that claimant was a malinger or was exaggerating symptoms for financial gain). Moreover, the ALJ observed that during the hearings, claimant exhibited no signs of significant discomfort, motor deficits, or mental dysfunction. (Tr. 283). Johnson, 240 F.3d at 1148 (appropriate for ALJ to consider personal observations made during hearing when determining credibility of claimant). These

observations are supported by substantial evidence on the record as a whole.

The undersigned finds that the ALJ considered claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from claimant's credibility.  See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, the courts normally defer to his credibility determination).  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out inconsistencies in the record that tended to militate against the claimant's credibility.  Those included claimant's failure to follow recommended treatments and to keep scheduled appointments, his lack of functional restrictions imposed by any physicians, the failure of any physician finding claimant to be disabled or unable to work, and his own observations of claimant during the hearing.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  Accordingly, the ALJ did not err in discrediting claimant's subjective complaints of pain.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

Claimant also contends that the ALJ committed reversible error by failing to articulate the weight to be given to the testimony of Debra Gore, his wife.

The determination of a witness's credibility is for the Commissioner, and not the Court, to

decide.  Benskin v. Bowen, 830 F. 2d 878, 882 ((8th Cir. 1987).  In the instant case in the earlier

decision dated October 27, 2000, the ALJ considered the testimony of Debra Gore under the

criteria in Polaski and determined to give her testimony no weight inasmuch as her testimony

relies primarily on claimant's statements.  (Tr. 281, 283).  Thus, the ALJ did make a specific

determinations with respect Mrs. Gore's credibility.[4]  Assuming arguendo that the ALJ did not

specifically discredit Mrs. Gore's testimony in his decision, the ALJ properly discredited

claimant's testimony regarding his subjective complaints and thus the ALJ was equally

empowered to reject the cumulative testimony of claimant's wife regarding his pain.  See Young

v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)(stating that failure of ALJ to specifically discredit

witness has no bearing on the outcome when witness testimony is discredited by same evidence

that proves claimant's testimony is not credible); Black v. Apfel, 143 F.3d 383, 387 (8th Cir.

1998); Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996);Bates v. Chater, 54 F.3d 529, 532-

33 (8th Cir. 1995) (the Eighth Circuit found no error committed by the ALJ's failure to make

express credibility findings as to third party's testimony after the ALJ had discounted claimant's

complaints of pain).

        Even if it cannot be said that the ALJ "explicitly" considered the Polaski factors, "an

ALJ's arguable deficiency in opinion-writing technique does not require [the Court] to set aside a

finding that is supported by substantial evidence."  Carlson v. Chater, 74 F.3d 869, 871 (8th Cir.

---

[4]Although claimant contends that the ALJ failed articulate a legally sufficient rationale for the
weight to accord Mrs. Gore, the undersigned noted that Mrs. Gore did not testify during the most
recent hearing, and the ALJ discussed the existence of third-party observations corroborating
claimant's complaints in the earlier decision of October 27, 2000, and articulated a rationale basis
for discrediting her testimony.  (Tr. 281, 283).  In the decision of September 10, 2002, the ALJ
specifically noted that claimant did not "present any new evidence or testimony convincing as to
total disability, any greater limitation of function assessed herein merely giving the claimant the
great benefit of the doubt."  (Tr. 27).

1996); see Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (although the Eighth Circuit prefers specific articulation of credibility findings, the court considers the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record); Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Thus the ALJ's determination should not be disturbed by this Court even if the ALJ's opinion does not make specific credibility findings as to claimant's wife's testimony. See Reynolds v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (administrative finding not required to be set aside when deficiency in opinion-writing technique has no bearing on outcome).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F2d at 821. Accordingly, the decision of the ALJ denying claimant's claims for benefits should be affirmed.

C.        Vocational Expert Testimony

Claimant contends that the testimony of the vocational expert did not constitute substantial evidence upon which a determination could be made that claimant was not disabled arguing only that the expert's opinion failed to include the concrete consequences of his impairments. In particular, claimant contends that the hypothetical opinion failed to contain the possible limitations of his memory and intellectual ability being altered secondary to his pain

medications.

After the ALJ has made a finding at step four that the claimant cannot perform his past work, he moves on to step five in which the burden shifts to the Commissioner to show that jobs exist in the economy that the claimant is able to perform. The ALJ will consider the claimant's age, education, and past work experience in determining whether such jobs exist. 20 C.F.R. § 404.1520. The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant. The question must "precisely set out the claimant's particular physical and mental impairments." Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984).

The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997). As discussed above, the ALJ properly accorded little weight to Dr. Lum's functional restrictions and findings inasmuch as the findings therein were inconsistent with and not supported by the objective medical evidence and the other evidence in the record. In addition, the undersigned notes that the ALJ based his hypothetical question on medical evidence contained in the record as a whole. Accordingly, claimant's claim that the hypothetical opinion given by the vocational expert was flawed inasmuch as it failed to contain the possible mental functioning limitations imposed by his medications, should be denied. This claim is without merit inasmuch as ALJ properly discredited claimant's complaints of mental functioning limitations imposed by his medications.

Finally, claimant asserts that the hypothetical question to the vocational expert failed to

include all of his impairments. The undersigned disagrees. While claimant argues that the vocational expert failed to include claimant's inability to stoop, a proper hypothetical must include only those impairments accepted as true by the ALJ. <u>Pearsall</u>, 274 F.3d at 1220. The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. Based on a proper hypothetical, the vocational testified that claimant was able to work a significant range of light work jobs which existed in significant numbers in the local and national economies. Therefore, substantial evidence supports the ALJ's determination that claimant was not disabled. <u>Id.</u>

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821. Accordingly, the decision of the ALJ denying claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this _23rd_ day of August, 2005.